**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CATHERINE ASHLEY, as administrator of the Estate of AMBER ADAMS, deceased, Plaintiff, | ) ) ) ) | |
| v. | ) ) | Case No. 12-cv-8309 |
| SCHNEIDER NATIONAL CARRIERS, INC., and SHAUN CHRISTOPHER JACKSON, Defendants. | ) ) ) ) ) | Judge Robert M. Dow, Jr. |

_____

| | | |
|---|---|---|
| JOSEPH MALY, Plaintiff, | ) ) ) | Case No. 13-cv-3042 Consolidated for all purposes with Case No. 12-cv-8309 |
| v. | ) ) | |
| SCHNEIDER NATIONAL CARRIERS, INC., and SHAUN CHRISTOPHER JACKSON, Defendants. | ) ) ) | Judge Robert M. Dow, Jr. |

**MEMORANDUM AND OPINION ORDER**

Before the Court are Plaintiff's motion for partial summary judgment [186], Defendants'

motion for summary judgment [189], and Defendant's *Daubert* motions to exclude the testimony

of Roger Barrette and Donald Hess [192, 193]. For the reasons set forth below, Plaintiff's motion

for summary judgment [186] is granted in part and denied in part, Defendants' motion for

summary judgment [189] is denied, and Defendant's *Daubert* motions [192, 193] are granted in

part and denied in part. This case remains set for a jury trial to commence on December 5, 2016.

The Court will set pre-trial deadlines in a separate order.

## I.    Background

This case arises out of fatal injuries that Plaintiff Amber Adams[1] sustained in an auto accident on April 7, 2012. Ms. Adams was a passenger in a vehicle driven by Nick Maly that crashed into the back of a tractor-trailer that Defendant Shaun Jackson had parked on the shoulder of an interstate highway west of Chicago. At the time of the accident, Defendant Jackson was employed as a truck driver for Defendant Schneider National Carriers, Inc., and was hauling a load of Fritos corn chips from San Antonio, Texas to Carol Stream, Illinois.

Just prior to the accident, Defendant Jackson was driving the Schneider-owned tractor-trailer northbound in the right lane of I-355, which, at that point, spanned four lanes. Around milepost 19.2, the highway expands to five lanes (Lanes 1–5), where the three left lanes (Lanes 1–3) continue northbound on I-355, and the two right lanes (Lanes 4–5) serve as the entrance to I-88. Defendant Jackson, who was at that time in Lane 5, realized that he was headed towards I-88, even though his pre-programmed GPS route instructed him to continue northbound on I-355. Jackson attempted to move his vehicle into the left lanes so as to continue on I-355, but he was unable to do so. Jackson decided to pull his tractor-trailer onto the shoulder (which was to the right of Lane 5) while he consulted his GPS for an alternate route. Whether or not Jackson was aware of it, his tractor-trailer was not entirely within the shoulder, such that approximately 20 inches of his tractor-trailer extended into Lane 5 (although there was sufficient space on the shoulder for Jackson to move his tractor-trailer completely off of the roadway). After approximately two or three minutes, Jackson decided to proceed onto I-88, and he put his tractor in gear and looked for an opening in the traffic to re-enter the highway. Before he was able to do so, his tractor-trailer was struck by a Mercury Montego driven by Nick Maly.

---

[1] Ms. Adams is represented by her mother, Catherine Ashley, who was appointed administrator of the estate of Amber Adams by the probate division of the Circuit Court of Lake County on May 29, 2012.

Nick Maly, along with passengers Amber Adams (his girlfriend, and the Plaintiff in this lawsuit) and Joe Maly (his father), were driving northbound on I-355 on their way to a hockey-related awards ceremony in nearby Aurora, Illinois. While the parties dispute various aspects of Nick Maly's driving that day, witnesses stated that Maly was "driving erratically," that he "was going crazy," that he "was flying," that he was "driving like an asshole, flying up real fast, way over the speed limit," and that "[h]e cut over all the lanes of traffic." [See 196, ¶¶ 26–47.] The data recorder recovered from Nick Maly's vehicle showed that at 7.4 seconds before impact, the vehicle's speed was 92 mph; at 5.8 seconds before impact, the vehicle's speed was 94.2 mph; and at the point of impact, the vehicle's speed was 57 mph. (The speed limit at the crash site was either 50 mph or 55 mph.) The first braking event occurred at 5.2 seconds before impact. There is a dispute as to whether, just prior to impact, Maly was attempting to move his vehicle from the shoulder back into Lane 5, or whether Maly was in Lane 5 as he approached Jackson's tractor-trailer. Regardless, Maly's vehicle struck the left rear of Defendants' trailer while it was still stopped on the shoulder, and Plaintiff Amber Adams died from the injuries that she sustained in that collision. Illinois Trooper Gerald Pulido ticketed Maly for improper lane usage and ticketed Jackson for improper parking on the roadway.

## II.  Summary Judgment

### A.  Legal Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Sallenger v. City of Springfield, Ill.*, 630 F. 3d 499, 503 (7th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2) and noting that summary judgment should be granted "if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party. See *Carter v. City of Milwaukee*, 743 F. 3d 540, 543 (7th Cir. 2014). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Koszola v. Bd. of Educ. of City of Chicago*, 385 F. 3d 1104, 1111 (7th Cir. 2004). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

**B.     Proximate Cause**

The parties agree that Illinois substantive law applies in this diversity suit, where this Court is tasked with using its "best judgment to estimate how the [Illinois] Supreme Court would rule" on the disputed issues of state law. *Valerio v. Home Ins. Co.*, 80 F.3d 226, 228 (7th Cir.

1996). To the extent that the Illinois Supreme Court has not spoken directly about an issue, the Court may give "proper regard" to the state's lower courts. *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465 (1967). To succeed on a negligence claim under Illinois law, a plaintiff must prove "that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999). Here, the only disputed issue is whether Defendants' actions were the proximate cause of Plaintiff's death. [191, at 4.]

Proximate cause is composed of two distinct requirements: cause in fact and legal cause. *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992); *Fitzgibbon v. Nat'l Broad. Co.*, 732 N.E.2d 64, 65 (Ill. App. Ct. 2000). To establish cause in fact, a plaintiff must show that the defendant's "conduct was a material element and a substantial factor in bringing about the injury." *Lee*, 605 N.E.2d at 502. "A defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred." *Galman*, 720 N.E.2d at 1071. Legal cause, by contrast, "is essentially a question of foreseeability," where courts must determine "whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.*

Subsumed within the legal cause analysis is the concept of intervening cause, which asks whether an intervening act by a third party caused the injury despite a prior contributing action by a defendant. This inquiry is encompassed by the "foreseeability" analysis of whether legal cause exists. See *Jinkins v. Evangelical Hosps. Corp.*, 783 N.E.2d 123, 127 (Ill. App. Ct. 2002) ("Where there is an intervening act by a third person, the test we apply is whether the first wrongdoer reasonably might have anticipated the intervening cause as a natural and probable result of the first party's own negligence."). If the intervening act was not foreseeable, it breaks

the causal chain such that the first wrongdoer is not considered the proximate cause of the injury. See, *e.g.*, *Billman v. Frenzel Const. Co.*, 635 N.E.2d 435, 439 (Ill. App. Ct. 1993) ("[T]his court has affirmed summary judgments granted on the ground that negligent driving broke the chain of causation." (citations omitted)).

Illinois courts also explain the concept of causation by drawing a distinction between a "condition" and a "cause," where "if the negligence charged does nothing more than furnish a condition by which the injury is made possible, and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury." *Galman*, 720 N.E.2d at 1071. The Illinois Supreme Court has commented that the "condition and cause" dichotomy is compatible with the more-traditional "proximate cause" rubric because both theories "ask the same question: Was the defendant's negligence a material and substantial element in bringing about the injury, and, if so, was the injury of a type that a reasonable person would see as a likely result of his or her conduct?" *Id.* at 1072.

Proximate cause is ordinarily a question for the trier of fact, *Fitzgibbon*, 732 N.E.2d at 65, and may be found as a matter of law only "when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable [people] as to the inferences to be drawn from them." *Merlo v. Pub. Serv. Co. of N. Ill.*, 45 N.E.2d 665, 675 (Ill. 1942).

Defendants focus on legal cause, pointing to a number of crash cases where courts granted summary judgment in favor of defendants, concluding that the accident was attributable to a separate, intervening cause. See, *e.g.*, *Sheehan v. Janesville Auto Transp.*, 430 N.E.2d 131, 133 (Ill. App. Ct. 1981) (defendant's illegal parking of a semi-trailer in a parking lane did not cause the plaintiff to swerve his vehicle into the curb lane and collide with the parked semi-

trailer); *Wuebbles v. Shea*, 13 N.E.2d 646, 647–48 (Ill. App. Ct. 1938) (defendant's parking too

near a sidewalk in violation of a local statute did not cause the plaintiff to swerve into the parked

vehicle); *Yates v. Shackelford*, 784 N.E.2d 330 (Ill. App. Ct. 2002) (it was not reasonably

foreseeable that defendant's parking his semi-trailer on the shoulder of the road in violation of a

local statute would result in an auto accident; instead, it was the plaintiff's speeding and

"unreasonable actions" that caused the collision); *Bogovich v. Nalco Chem. Co.*, 572 N.E.2d

1043, 1045 (Ill. App. Ct. 1991) (defendant's parking on a median strip was not the cause of the

accident because the plaintiff's loss of consciousness was a separate, intervening cause); see also

*Galman*, 720 N.E.2d at 1073 (tanker truck that was illegally parked in a "no parking" zone was

not the cause of the plaintiff's injuries because it was not reasonably foreseeable that a pedestrian

would jaywalk across four lanes of traffic).

While these cases are instructive as to the proximate cause standard as applied to traffic

accident cases, they are all distinguishable from this case based on the fact that the defendants'

vehicles, although illegally parked, were not obstructing traffic. Just because a vehicle is parked

illegally does not mean that a traffic accident is likely to result from the parking infraction. *Cf.*

*Batteast v. Wyeth Labs., Inc.*, 560 N.E.2d 315, 323 (Ill. 1990) (holding that even when a

violation of a safety statute amounts to prima facie evidence of negligence, a plaintiff must still

establish that the statutory violation was the proximate cause of the injury).[2] Conversely, a driver

who creates a likelihood of a collision by obstructing traffic is not categorically absolved of that

---

[2] For this same reason, Plaintiff's argument that she is entitled to summary judgment because Defendant
Jackson violated § 11-1301(a) of the Illinois Vehicle Code is unavailing. See also *Coole v. Central Area
Recycling*, 893 N.E.2d 303, 310 (Ill. App. Ct. 2008) ("[W]hile a statutory violation is *prima facie*
evidence of negligence, that fact itself does not create liability, as the statutory violation must have been
the direct and proximate cause of the injury before liability will exist."); *Belvidere National Bank & Trust
Co. v. Leisher*, 403 N.E.2d 1054, 1059 (Ill. App. Ct. 1980) ("Although violation of statutes, ordinances or
codes is conclusive to show defendant's breach of duty (leaving only the question of proximate cause),
compliance with codes and safety regulations is not conclusive evidence on the question of negligence.").

wrongful conduct just because the victim also acted negligently. See *Wright v. Gen. Motors Corp.*, 479 F.2d 52, 53 (7th Cir. 1953) ("Under Illinois law, before an intervening force will relieve a defendant from liability for his wrongful conduct, the intervening force must itself be outside the range of reasonable anticipation as a consequence of the defendants' wrongful conduct."). Here, Defendants' vehicle extended into the traffic lane approximately 20 inches, such that reasonable jurors could disagree as to whether Defendants' actions were likely to result in a traffic accident, regardless of whether the intervening actor was speeding and/or swerving leading up to the collision. See, *e.g.*, *Wright*, 479 F.2d at 53–54 ("When a vehicle suddenly comes to a halt on a public highway, we do not believe that an attempt to make emergency repairs on the vehicle or the vehicle's being struck by another vehicle are outside the range of reasonable anticipation. In any event, since there is room for an honest difference of opinion, the issue of proximate causation presents a question of fact for the jury to resolve.").

Plaintiff says that "[b]ecause of the good faith settlements with Nick Maly and his father Joseph Maly, Illinois law dictates that [D]efendants must be liable unless Nick Maly is the *sole* proximate cause of [Plaintiff's] death." [187, at 7.] Plaintiff then argues that because Defendants admit that Defendant Jackson "contributed to" the collision, Nick Maly cannot, "by law and mathematics," be "the sole proximate cause" of Plaintiff's death. [*Id.*] This so-called admission comes from Defendants' traffic reconstruction expert Michael DiTallo, who said in his expert report that Defendant Jackson "contributed to this collision by stopping—parking with part of his semi-trailer partly in the travel lane." [188, ¶ 39; 199, ¶ 39.]

Plaintiff's argument is unavailing. Even if the Court were to construe Mr. DiTallo's statement as a judicial admission by Defendants—a dubious contention[3]—this "admission"

---

[3] See *Keller v. United States*, 58 F.3d 1194, 1199 (7th Cir. 1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party

relates only to cause in fact, not legal cause. But Defendants do not dispute that they were a cause in fact of the collision. [200, at 3 ("It is clear that Jackson was a cause-in-fact of this accident. No witness, expert or jury could deny this without denying the laws of physics.").] And, of course, proximate cause has *two* components, both of which must be satisfied to establish negligence. Thus, the fact that Defendants concede that they were a cause in fact of the accident does not make it impossible (by law or by mathematics) for Defendants to establish that Nick Maly was the sole proximate cause of the accident.

Although the facts surrounding this accident are largely undisputed, proximate cause may be found as a matter of law only "when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." *Merlo*, 45 N.E.2d at 675. Here, a jury could disagree about whether a reasonable person would foresee that a vehicle extending 20 inches into a traffic lane was likely to cause an accident, or whether the intervening actions of Nick Maly caused the collision. As such, neither party is entitled to summary judgment on the issue of proximate cause.

### C.    Affirmative Defenses

Plaintiff has moved for summary judgment on Defendants' first, second, and third affirmative defenses. The Court addresses each argument in turn.

#### 1.    Defendants' First Affirmative Defense

In their first affirmative defense, Defendants argue that any supposed negligence related to Defendant Jackson's parking of his vehicle was due to a sudden emergency. Under Illinois

---

making them. They may not be controverted at trial or on appeal * * *. When a party testifying at trial or during a deposition admits a fact which is adverse to his claim or defense, it is generally preferable to treat that testimony as solely an evidentiary admission."); *Solon v. Gary Community School Corp.*, 180 F.3d 844, 858 (7th Cir. 1999) ("A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party."); see also *Bianco v. Hulsteg AB*, 2009 WL 347002, at *12–13 (N.D. Ill. Feb. 5, 2009) (expert's deposition testimony was not a judicial admission).

law, "[a] driver confronted with an emergency situation is not expected to behave with the same composure and judgment as would be required in circumstances where imminent danger is not involved." *McCraw v. Cegielski*, 680 N.E.2d 394, 398 (Ill. App. Ct. 1996). The reasonableness of the actions of a driver confronted with a sudden emergency is measured by what a reasonable person would do under the same or similar circumstances. *Id.*; see also *Ball v. Continental Southern Lines, Inc.*, 360 N.E.2d 81, 83 (Ill. App. Ct. 1977) ("When faced with a sudden emergency or imminent peril, the driver of an automobile must exercise that degree of care and caution which an ordinarily prudent and careful person would exercise under the circumstances."). However, in order to qualify as an "emergency situation," "the emergency must arise without fault on the part of the person seeking its shield." *Apcon Corp. v. Dunn*, 562 N.E.2d 386, 388 (Ill. App. Ct. 1990).

Here, Defendants argue that the sudden emergency was "the ill constructed exchange ramp that funneled drivers in the right lane on to I-88." [200, at 13.] To support their claim, Defendants point to the fact that the Illinois State Highway Toll Authority ("ISHTA") recently installed "a large guide sign" to provide guidance to drivers approaching the I-355 and I-88 exchange in order to improve traffic flow, based on ISHTA's assessment that the signage installed at the time of the accident "did not accurately depict where traffic needed to be in order for drivers to get to the appropriate destination." [200, at 14.]

Defendants' argument is unavailing. While the Court accepts Defendants' statement that "[t]here is no requirement that the emergency must be a mechanical breakdown or a medical emergency," [200, at 15], that does not justify the inclusion of common roadway inconveniences as "sudden emergencies" as a matter of law. In addition, Defendants' argument would mean that all drivers who passed through this "ill constructed" exchange—who were all subject to the same

signage as Defendant Jackson—were confronted with a sudden emergency. This is hardly the type of emergency that entitles a party to a heightened-standard-of-care instruction.

The Court also disagrees with Defendants' statement that there is no "time limit" on how long a defendant is entitled to this "sudden emergency" standard. [200, at 15.] Here, even if the signage presented an emergency situation, that emergency dissipated over the subsequent two-to-three minutes while Defendant Jackson was parked on the side of the road, reviewing his GPS and devising a new route. See *Apcon*, 562 N.E.2d at 388 ("The trial court also could determine whether the emergency was ongoing [and] whether defendant had sufficient time to determine the best course of conduct to pursue * * *."). Because Defendant Jackson was no longer "faced with a sudden emergency or imminent peril" after he pulled to the side of the road, his alleged "sudden emergency" ended, and with it any entitlement to a heightened-standard-of-care instruction.

The parties cite very few cases that endorse this "sudden emergency" instruction, and no cases that post-date 1996. See *McCraw*, 680 N.E.2d at 398. This is not surprising, considering the rejection of a similar instruction by the Illinois Pattern Jury Instruction Committee:

> An instruction which states that the law does not require a person to act with deliberation and care in the face of an unexpected danger not caused by his own negligence should not be given for three reasons. First, it is argumentative. Second, it states a simple and obvious fact about human behavior. Third, except in the most obvious case when no juror would need to be reminded of the proposition, it will probably lead to reversible error.

IPI 4.13, Comment; see also IPI 4.13 ("The Committee recommends that no instruction either on the duty of one in imminent peril or the responsibility of the person causing the perilous situation be given."); *Bloomquist v. Ely*, 617 N.E.2d 474, 482 (Ill. App. Ct. 1993) ("We note the Committee on Jury Instructions in Civil Cases recommends that no instruction be given on the duty of one in imminent peril.").

While "Illinois Pattern jury instructions are not binding," *Welch v. United States*, 604 F.3d 408, 421 n.15 (7th Cir. 2010) (quoting *People v. Peete*, 743 N.E.2d 689, 695 (Ill. 2001)), the Court finds the Committee's commentary persuasive, especially the observation that the "sudden emergency" instruction states a simple and obvious fact about human behavior that is otherwise encapsulated in the standard jury instruction regarding negligence. To be clear, Defendants are free to argue that Defendant Jackson did exactly what "a reasonably careful person would do * * * under circumstances similar to those shown by the evidence," IPI 10.01, including circumstances related to the signage on the highway. But the prospect of presenting this argument as an affirmative defense (as opposed to just a standard defense) implies that Defendants would be eligible for a *different* standard of negligence if they establish that Defendant Jackson was responding to a "sudden emergency." Without commenting on whether such an instruction would ever be warranted, the Court concludes that a "sudden emergency" instruction is not appropriate here.

For these reasons, Plaintiff's motion for summary judgment on Defendants' first affirmative defense is granted. Defendants may still present evidence at trial regarding their argument that Defendant Jackson was acting reasonably in response to the signage on the highway, but Defendants are not entitled to a separate "sudden emergency" jury instruction.

## 2. Defendants' Second and Third Affirmative Defenses

Defendants argue in their second and third affirmative defenses that the negligent conduct and/or intentional, willful, and reckless conduct of Nick Maly was the sole proximate cause of Plaintiff's injury. These are not affirmative defenses, but rather are arguments that rebut Plaintiff's burden of proving causation. As the Supreme Court of Illinois put it:

> In any negligence action, the plaintiff bears the burden of proving not only duty and breach of duty, but also that defendant proximately caused plaintiff's injury.

The element of proximate cause is an element of the *plaintiff's* case. The defendant is not required to plead lack of proximate cause as an affirmative defense. Obviously, if there is evidence that negates causation, a defendant should show it. However, in granting the defendant the privilege of going forward, also called the burden of production, the law in no way shifts to the defendant the burden of proof.

*Leonardi v. Loyola Univ. of Chicago*, 658 N.E.2d 450, 455 (Ill. 1995) (internal citations omitted). Because these are not true affirmative defenses, there are no issues on which the Court can grant summary judgment. Thus, as a technical matter, Plaintiff's motion is denied. However, Defendants' second and third affirmative defenses nonetheless are stricken as improper under the law. To be clear, nothing in this order shall preclude Defendants from arguing at trial that Nick Maly was the sole proximate cause of Plaintiff's injury, or from making any other arguments attempting to negate Plaintiff's showing of causation.

## III.    *Daubert* Motions

### A.    Legal Standard

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. See *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 requires that the district judge act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741–42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)); see also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589.

In reviewing a motion to exclude testimony under Rule 702, the district court must "ascertain whether the expert is qualified, whether his or her methodology is scientifically

reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis*, 663 F.3d at 893–94 (quoting Fed. R. Evid. 702); see also *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (outlining the "three-step analysis" for assessing the admissibility of expert testimony). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); see also *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

*Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. "[T]he test of reliability is flexible," however, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted); see also *Pansier*, 576 F.3d at 737 (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable" (emphasis omitted) (citing *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir. 2007))); *Lewis*, 561 F.3d at 704–05 ("[T]he law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation." (citation omitted)).

In assessing the admissibility of proposed expert testimony, the Court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. However, as the Supreme Court has recognized, "conclusions and methodology are not entirely distinct from one another," and while "[t]rained experts commonly extrapolate from existing data[,] * * * nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. In other words, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)). In short, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Where that link is missing, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at 146.

### B.      Plaintiff's Expert Donald Hess

Plaintiff disclosed Donald Hess as an expert on the standards governing truck drivers. Mr. Hess, who is 63-years old, was a truck driver off and on between 1971 and 1989, and since 1992 has been a classroom instructor regarding truck driving. He is currently the director of transportation and public safety programs at John Wood Community College in Quincy, Illinois. Defendants move to exclude 15 separate opinions offered by Plaintiff's expert Donald Hess (which the Court has condensed into seven categories), and also argue generally that Mr. Hess is not qualified to give *any* opinions about the standards for truck drivers.

Before delving into the opinion-by-opinion analysis, the Court notes several guiding principles that apply to many of Defendants' objections. Generally speaking, the fact that Mr. Hess has more than 40 years of experience in truck driving, both as a driver and as an instructor, is sufficient to qualify him to testify as an expert in this field. See Fed. R. Evid. 702 (an expert may be qualified by "knowledge, skill, experience, training, or education"); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("While 'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert, 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.'" (internal citations omitted)). However, "[a] court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even '[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.'" *Smith*, 215 F.3d at 718 (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)); see also *Bielskis*, 663 F.3d at 894 (an expert's opinion "must be reasoned and founded on data"). That's because "the court's gatekeeping function focuses on an examination of the expert's methodology," *Smith*, 215 F.3d at 718, such that courts do not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. Accordingly, while Mr. Hess may be generally qualified to offer expert opinions on the trucking industry, to ensure that Mr. Hess's opinions in this case are reliable, the Court must examine his methodologies to ensure that his opinions are reasoned and founded on data. See *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748 (7th Cir. 2010) (an expert must "explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line'").

Two additional principles guide the Court's analysis regarding Mr. Hess. First, "if [an expert] is to give testimony to assist jury members and expand their knowledge * * *, [the expert] must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998); *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 602–03 (7th Cir. 2011) ("[W]hen the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible."); Fed. R. Evid. 702 (requiring that expert testimony must "assist the trier of fact to understand the evidence or determine a fact in issue"). "The court does not have to exclude an expert just because the testimony may cover matters that are within the average juror's comprehension, but an expert must testify to something more than what is obvious to the layperson in order to be of assistance to the jury." *Poulter v. Cottrell, Inc.*, 2014 WL 5293595, at *4 (N.D. Ill. June 24, 2014) (citing *Ancho*, 157 F.3d at 519). Second, an expert is not entitled to offer opinions outside of his or her realm of expertise. See *United States v. Pree*, 408 F.3d 855, 871 (7th Cir. 2005) (expert testimony that is "outside the [expert's] area of expertise" is "not admissible as expert testimony" (citing *United States v. Benson*, 941 F.2d 598, 615 (7th Cir. 1991))). As a corollary to this rule, an expert is not allowed to present legal conclusions. "When an expert offers an opinion relevant to applying a legal standard such as probable cause, the expert's role is 'limited to describing sound professional standards and identifying departures from them.'" *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (quoting *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997)); see also *United States v. Blount*, 502 F.3d 674, 680 (7th Cir. 2007) ("There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts."); *Mintel Int'l Grp., Ltd. v. Neergheen*, 636 F. Supp. 2d 677,

683 (N.D. Ill. 2009); *Bone Care Int'l LLC v. Pentech Pharm., Inc.*, 2010 WL 3928598, at *14 (N.D. Ill. Oct. 1, 2010).

### 1.  Opinion Regarding the Design of the Interstate Highway System

Mr. Hess states in his expert disclosure that "[t]he Interstate Highway system is designed for use by non-commercial vehicles and commercial tractor-trailers. All signs and bridges over Interstate Highways are constructed at a height so that they do not interfere with the passage of trucks underneath them." [193-3, at 2.] Defendants seek to exclude Mr. Hess from offering this testimony, arguing that it is nothing more than an unsupported assumption. Defendants point to excerpts from Mr. Hess's deposition testimony where he allegedly contradicted this statement, testifying that he has no knowledge of whether there is a normal height for signs and bridges over an interstate (Plaintiff's counsel report, based on information found on the Department of Transportation's website, that the normal height is 14 feet), and that some interstates in the United States (such as those in Atlanta) are not designed for use by all commercial vehicles. Mr. Hess testified that the basis for this statement is his own "personal knowledge."

Mr. Hess's statement about the interstate highways is more of a factual assertion rather than an expert opinion (the opinion based on this "fact" comes later). Defendants impugned the validity of Mr. Hess's factual assertion that "*[a]ll* signs and bridges over Interstate Highways are constructed at a height so that they do not interfere with the passage of trucks underneath them" by eliciting testimony that, in fact, not all signs and bridges are constructed in this manner. Defendants also uncovered that Mr. Hess lacked any factual basis supporting his assertion other than his own personal knowledge. That being said, "[w]hen the factual underpinning of an expert's opinion is weak, it is a matter affecting the weight and credibility of the testimony—a question to be resolved by the jury." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11,

22 (7th Cir. 2011)). While Plaintiff's expert would have made the Court's decision easier by citing some credible source in support of his statement (*e.g.*, the DOT website that Plaintiff's counsel provided and urged the Court to take judicial notice of), Mr. Hess's 40 years of experience in the trucking industry allows him to offer generalized facts based on his personal knowledge about his industry. In this instance, Mr. Hess is entitled to testify based on his personal knowledge of the interstate highway system, and to the extent that Defendants disagree with the factual underpinnings of Mr. Hess's statements, they are free to cross-examine him (including with his deposition transcript) to make their points to the jury.[4] Defendants' motion to bar this testimony is denied.

### 2. Opinions Regarding Jackson's Knowledge of I-88

Defendants seek to bar a statement that Mr. Hess made at his deposition that Defendant Jackson should have known that I-88 East to Chicago would not have turned into a residential area with low clearances and thus it was safe to travel on that roadway. Setting aside the reliability of this opinion, an expert is not entitled to offer opinions that are not included in the expert's Rule 26 disclosure. A party using a retained expert is required to furnish, prior to trial, a report containing "a *complete* statement of *all* opinions to be expressed and the basis and reasons therefor." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). A party is not permitted to use any information not so disclosed as evidence at a trial. Fed. R. Civ. P. 37(c)(1). "This sanction is 'automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.'" *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir. 2005) (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). Because Mr. Hess

---

[4] Jurors could rely on their own observations and common sense regarding the height of signs and bridges on the interstate highways—*e.g.*, that there is likely to be some national standard that allows tractor-trailers to operate without the constant concern of collision, otherwise one would expect to see either more accidents or fewer tractor-trailers. Nonetheless, it will be helpful to have direct- and cross-examination on this point because jurors are unlikely to have considered the issue in a systematic way.

presented this opinion in his deposition, not in his Rule 26 disclosure, he is not permitted to offer that opinion at trial.

Defendants also seek to bar two similar statements that Mr. Hess *did* include in his expert disclosures, namely that "[b]efore departing, a driver must know alternative routes in case the primary route is unavailable," and that Defendant Jackson "lacked knowledge of the Interstates in the area of the crash. If he had simply exited I-88 east, he could have immediately re-entered I-355 north and continued to his destination without stopping his tractor-trailer on the roadway and shoulder." [193-3, at 3–4.] Defendants agree that if Jackson had remained on I-88 East, he would have had the opportunity to get back onto I-355 North about one mile down the road. [193, at 7.] But Defendants object to the opinion portion of Mr. Hess's statements, arguing that Mr. Hess "gave no basis for his opinion that Jackson lacked knowledge of the Interstate and should have known I-88 would reconnect with I-355 a mile north." [193, at 7.]

As to Mr. Hess's opinion that Jackson lacked knowledge of the interstate highways in the area of the crash, this point will be self-evident to the jurors without the assistance of expert testimony. That is, once Mr. Hess testifies that there is an entrance ramp back onto I-355 approximately one mile down on I-88, the jurors will be able to conclude on their own that had Jackson known this fact, he would have kept driving rather than pulling over to check for directions. Thus, expert testimony is not necessary on this point, and the issue of whether Mr. Hess has a reliable basis for this opinion is irrelevant. See *Florek*, 649 F.3d at 602–03 ("[W]hen the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible."); *Ancho*, 157 F.3d at 519.

As to Defendants' argument that Mr. Hess lacked a basis for opining that Jackson should have known that I-88 reconnected with I-355, Defendants misstate Mr. Hess's opinion. What

Mr. Hess said in his expert disclosures is that a driver must know alternate routes; Mr. Hess did not say that Defendant Jackson should have known about this particular exchange between I-88 and I-355. When questioned about it at his deposition, Mr. Hess confirmed that he "wouldn't expect [Jackson] to know that." [193-4, at 24.] Thus, while it appears as though Mr. Hess does not intend to offer an opinion about whether Jackson should have known that I-88 reconnected with I-355 about one mile past the crash site, he is barred from offering this opinion at trial because it is not included in his expert disclosures. Mr. Hess may testify, subject to cross-examination, as to his opinion that a driver must know alternative routes in case the primary route is unavailable.

### 3. Opinion Regarding Parking on Entrance and Exit Ramps

Defendants seek to bar Mr. Hess's statement that "[e]ntrance and exit ramps on highways are dangerous places to stop/park a tractor-trailer," [193-3, at 2], arguing that this statement is irrelevant because it is undisputed that Defendant Jackson was stopped on the shoulder of the highway, *not* on an entrance or exit ramp. The Court agrees, and Defendants' motion is granted as to this opinion.

### 4. Opinions Regarding Emergency Situations

Mr. Hess offers the following general statements about "emergencies":

- A tractor-trailer driver is only permitted to stop his/her truck on a shoulder in an emergency situation. Emergency situations include: (A) An illness such that the driver can no longer safely drive/control the truck; and (B) A mechanical failure such that the driver can no longer safely drive the truck.

- A driver getting lost is not an emergency that justifies stopping and/or parking on the shoulder of a highway. A driver being unable to make a lane change (stuck in a right lane) is not an emergency that justifies stopping and/or parking on the shoulder of the highway.

[193-3, at 2–3.] And based on these statements, Mr. Hess offers the following opinion:

- Without an emergency situation, [Defendant Jackson] stopped his tractor-trailer on the roadway and shoulder of northbound I-355 at I-88. He did not have a valid reason to stop his tractor-trailer on the roadway and shoulder when he did so.

[193-3, at 4.] Defendants move to bar Mr. Hess from making these statements to the jury, arguing that the term "emergency" is a legal term and Mr. Hess is not entitled to instruct the jury as to the law, nor is he qualified to testify regarding what is and is not an emergency. The Court disagrees. The Court already granted summary judgment on Defendants' affirmative defense regarding "sudden emergency," and without the "sudden emergency" instruction, the term "emergency" carries no legal significance in this case, and there is no danger of confusing the jury by using that term. See, *e.g.*, *Richman v. Sheahan*, 415 F. Supp. 2d 929, 947–48 (N.D. Ill. 2006) ("Where the testimony contains terms that have a separate, distinct, and specialized meaning in the law different from that present in the vernacular, the testimony may be deemed to constitute a legal conclusion and exclusion would not be inappropriate. However, where, as here, the word also has an everyday meaning, the testimony should not be excluded as constituting a legal conclusion."). To the extent that Defendants have concerns that Mr. Hess's statements will come across as legal conclusions, they are free to question Mr. Hess on that point and, if necessary, to ask the Court to instruct the jury on this point as well.

Defendants argue in the alternative that if the term "emergency" is not a term of legal art to be defined by the Court, then it is a common sense term to be interpreted by the jury, such that Mr. Hess's commentary as to what is and is not an emergency is unhelpful layperson testimony. See *Florek*, 649 F.3d at 602–03 ("[W]hen the testimony is about a matter of everyday experience, expert testimony is less likely to be admissible."). Again, the Court disagrees. Mr. Hess's testimony about what constitutes an emergency to a truck driver—*i.e.*, particularly the type of emergency that warrants pulling over to the side of the road—could assist the jury in

deciding whether Defendant Jackson acted negligently. Defendants' motion as to these issues is denied.

### 5. Opinion Regarding Jackson's Lane Positioning

Defendants seek to exclude Mr. Hess's opinion that Defendant Jackson should have moved his tractor-trailer over to the left lanes of I-355 before he approached the I-88 exit, so as to avoid being "forced" down I-88 East. Defendants argue that Mr. Hess's opinion is based on the assumption that "there are always signs," whereas Defendants contend that the signage in the area at that time was not adequate to inform Jackson of the necessary lane positioning.

As an initial matter, Defendants claim that this opinion originated in Mr. Hess's deposition. If this were true, exclusion would be mandatory because all expert opinions must appear in the expert's disclosures. See Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 37(c)(1). But Mr. Hess did disclose his opinion that Defendant Jackson failed to operate his tractor-trailer in a reasonably careful manner in that he "failed to move his tractor-trailer to a northbound lane as he approached the I-88 interchange so that he could continue northbound on I-355 to his destination," which is a sufficient disclosure for the opinion in question.

As to the opinion itself, Mr. Hess states in his expert disclosure that he reviewed numerous reports and photographs of the scene of the accident, as well as various relevant deposition transcripts, including those of Defendant Jackson, various Illinois State troopers, and Illinois State Toll Highway Authority representative John Benda. Mr. Hess's review of these materials, combined with his experience and expertise in the trucking industry, provide him with a sufficient basis to opine on the propriety of Defendant Jackson's lane positioning leading up to the accident. To the extent that Defendants feel that Mr. Hess has misread, misinterpreted, or

failed to properly investigate the underlying facts, they are free to address those points during Mr. Hess's cross-examination. Defendants' motion to exclude this opinion is denied.

### 6. Opinion Regarding Jackson's Qualcomm GPS Device

Defendants seek to exclude Mr. Hess's opinion that once Defendant Jackson realized that he was being channeled onto I-88, he should have rerouted his Qualcomm GPS while he was driving in order to determine if I-88 was an approved truck route, and that Jackson did not need to pull over to the shoulder to do so. [193, at 15.] Because Mr. Hess did not include this opinion in his Rule 26 disclosures, he is prohibited from offering this opinion at trial. See Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 37(c)(1). In addition, when questioned about the Qualcomm GPS system, Mr. Hess admitted that he is not an expert on Qualcomm, and that his opinions regarding the functionality of that system were either speculative or were based on a generalized knowledge of GPS systems that does not differ from a layperson's understanding. [193-4, at 17–18.] Mr. Hess's opinion is thus unreliable, and must be excluded. See Fed. R. Evid. 702; *Winters*, 498 F.3d at 741–42.

### 7. Opinions Regarding Jackson's Violation of Policies and Statutes

Defendants also move to exclude Mr. Hess's opinions regarding whether Defendant Jackson violated certain policies or procedures.

- By stopping his tractor-trailer partially on the roadway, Jackson violated 625 ILCS 5/11-1301 of the Illinois Vehicle Code * * *.

- By stopping his tractor-trailer partially on the roadway, Jackson violated Illinois State Toll Highway Regulations * * *.

- By stopping his tractor-trailer partially on the roadway, Jackson violated Schneider company policies * * *.

[193-3, at 4–5.] To reiterate the relevant standard, "[w]hen an expert offers an opinion relevant to applying a legal standard * * *, the expert's role is 'limited to describing sound professional

standards and identifying departures from them.'" *Jimenez*, 732 F.3d at 721 (quotation omitted); *Blount*, 502 F.3d at 680 ("There is a difference between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts.").

Mr. Hess's opinions as to whether Defendant Jackson violated Illinois' Vehicle Code or its Highway Regulations are impermissible legal conclusions. The only "opinion" that Mr. Hess offers (other than the legal conclusions themselves) is that Jackson violated the "sound professional standard" that prohibits truck drivers from parking their vehicles partially in roadways. But the fact that the trucking industry proscribes this practice is of no assistance when it comes to analyzing the statutory and regulatory language, such that Mr. Hess's only relevant contribution to this analysis is his assertion of the undisputed fact that Jackson's vehicle was stopped partially on the roadway. Because this fact is undisputed, and because Mr. Hess's unartful application of this fact to the statutory language is "obvious to the layperson," (*i.e.*, Jackson was stopped in the street; the statute and regulation proscribe stopping in the street; *ergo*, Jackson violated the statute and regulation), Mr. Hess's testimony is unlikely to be of any particular assistance to the jury,[5] and thus is excludible on that ground. *Ancho*, 157 F.3d at 519.

In addition, the determination of whether Jackson's act of stopping partially on the roadway violated these Illinois laws and regulations requires a deeper analysis than Mr. Hess offers, including the need to interpret various terms within the provisions (*e.g.*, what constitutes "an unobstructed width of the highway opposite a standing vehicle,"[6] and what constitutes an "emergency" under Illinois law), and it is the duty of the Court, not experts, to determine the

---

[5] It is unclear why Defendant Jackson's compliance with this law and this regulation is relevant to the jury. But Defendants do not object to relevance, so the Court does not address that issue here.

[6] When asked about the meaning of this provision at his deposition, Mr. Hess testified, "You know, I'm just not clear whether they mean that lane right adjacent to him or do they mean opposite direction, so I'm not a hundred percent sure on that one, on that part of it." [193-4, at 27.] This raises a red flag. *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994) ("A district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks.").

meaning of statutes and regulations. *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("The only legal expert in a federal courtroom is the judge."); see also *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900–01 (7th Cir. 1994) ("The meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts."). There is simply too large of an analytical gap between Mr. Hess's factual assertions and his legal conclusions—a gap that Mr. Hess fills with his own statutory and regulatory interpretation—to allow Mr. Hess to offer these legal conclusions.

These concerns are less pronounced when it comes to Mr. Hess's conclusion that Jackson violated Schneider company policies. Mr. Hess has decades of experience in instructing truck drivers on highway safety protocols, and it is not beyond the scope of his expertise to review a trucking company's driver's manual and to opine whether Jackson ran afoul of the company's standards. Mr. Hess has a suitable basis for making these conclusions, based on his review of, among other things, Schneider's "Your Highway to Success" manual, Jackson's signed "Safety Policies" test, and various deposition transcripts. A trier of fact could benefit from Mr. Hess's opinions regarding Schneider's policies and Jackson's adherence to them. To the extent that Defendants' feel that Mr. Hess has misinterpreted Schneider's policies or misapplied them to the facts of this case, that is something that they are free to address in their cross-examination. Defendants' motion to exclude this opinion is denied.

### 8.    Hess's Qualifications to Testify About Standard for Truck Drivers

Defendants' final argument is that Mr. Hess should be barred altogether from offering any opinions about the standards for truck drivers because he "has not been a truck driver in 27 years," and because "there are no standards to be certified as a truck driving instructor." [193, at 29.] The Court is not persuaded. Mr. Hess has approximately 20 years of experience as a truck

26

driver, and approximately 20 years of experience teaching truck driving standards. He has spent his entire adult life in the industry, and holds a director position at a community college where he has designed, organized, and implemented a truck driver training program from the ground up. [197-1, at 1.] Defendants have failed to show that Mr. Hess lacks the "knowledge, skill, experience, training, or education" to testify as an expert in the field of truck driving. Fed. R. Evid. 702. This ruling does not impact the Court's itemized rulings above limiting the scope of Mr. Hess's testimony.

### C.     Plaintiff's Expert Roger Barrette

Plaintiff disclosed Roger Barrette of Cooper Barrette Consulting, LLC, as a traffic crash reconstructionist to opine on several issues related to the accident, including (1) the position of the vehicles at the time of impact, (2) the approach path of the vehicles to the impact location, (3) the speed of the vehicles at and prior to impact, (4) a time–distance analysis leading up to the time of the crash, and (5) crash avoidance. Mr. Barrette offered 11 numbered conclusions in his expert report [see 192-4, at 21–22], and Defendants seek to exclude various statements and conclusions made throughout that report.

By way of background, Mr. Barrette has worked as a consultant and expert witness in the area of traffic accident investigation and reconstruction for over 20 years, and he maintains various certifications and professional affiliations relevant to that field. Mr. Barrette holds a bachelor's degree in mechanical engineering and a master's degree in civil engineering, and is a frequent publisher in the field of traffic crash reconstruction. He has attended over 2600 hours of courses and seminars in traffic safety over the past three decades. He also has extensive teaching and lecturing credentials, including a currently-held position with the Center for Public Safety at Northwestern University where he teaches accident investigation and reconstruction courses.

Mr. Barrette also has a law enforcement background that includes work as a part-time patrolman; an eight-year stint as a Deputy Sheriff, Highway Patrol Division for the Lake County Sheriff's Police in Waukegan, Illinois; and a position as an adjunct instructor and advisor at the College of Lake County in Grayslake, Illinois teaching courses in traffic law enforcement and traffic administration.

In preparing his expert report, Mr. Barrette reviewed, among other materials, (1) police reports, (2) deposition transcripts, (3) transcribed statements from crash witnesses, (4) photographs from the crash scene, (5) reconstruction reports, and (6) materials provided by Defendant Schneider regarding Defendant Jackson and his tractor-trailer. [See 192-4, at 5–6.]

### 1. Opinion That Nick Maly's Speed Was Not A Contributing Factor

Defendants seek to exclude the following opinion offered by Mr. Barrette:

> The Mercury was traveling at 73.5 mi/hr when [Nick Maly] entered the right-hand I-88 traffic lane 125 feet from impact. Had the driver been traveling at 55 mi/hr at this point (125 feet from impact), the Mercury would have impacted the semitrailer at 31 mi/hr instead of 57 mi/hr. Therefore, the speed reported in the PCM above 55 mi/hr leading up to impact, is not a contributing factor to the outcome of this collision.

[192-4, at 22.] More specifically, Defendants' objection relates to Mr. Barrette's opinion that regardless of whether Nick Maly's vehicle was traveling at 57 mph or 31 mph at the point of impact, "the penetration into Amber's occupant compartment would have still occurred to the same degree it did in this crash," *i.e.*, there would have been *no change* in the "outcome of the collision," such that Nick Maly's speed was "not a contributing factor to the outcome of [the] collision." [192-4, at 21.] Defendants argue that any opinion as to the difference in the outcomes from collisions of varying speeds would require testing and expertise (*e.g.*, biomechanical engineering and human factors) that are not present here. The Court agrees.

Again, while "[t]rained experts commonly extrapolate from existing data[,] * * * nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. Here, the first half of Mr. Barrette's opinion—*i.e.*, that if Nick Maly had been traveling at 55 mph instead of 73.5 mph when his vehicle was 125 feet from impact, his speed at impact would have been 31 mph instead of 57 mph—is relevant, scientifically supported, and within the scope of expertise of an accident reconstructionist.[7] But the second half of Mr. Barrette's opinion—*i.e.*, that there is no difference in outcome between a 31 mph collision and a 57 mph collision—is not scientifically reliable. From a methodological standpoint, determining the difference in outcome between collisions of two different speeds is surely a calculable task, potentially one within the scope of expertise of crash reconstructionist such as Mr. Barrette. But in this instance, Mr. Barrette did not use any particular methodology to reach his conclusion, including any analysis of the variance in mechanical forces acting upon the vehicles or the biomechanical forces acting upon the passengers within the vehicles. Mr. Barrette's conclusion that the damage to Nick Maly's vehicle "would have still occurred *to the same degree*" at either impact speed such that Nick Maly's speed was "not a contributing factor to the outcome of [the] collision," [192-4, at 21 (emphasis added)]), is nothing more than the *ipse dixit* of the expert, and therefore must be excluded. See *Bielskis*, 663 F.3d at 896–97

---

[7] Defendants challenge this portion of Mr. Barrette's opinion as well, arguing that Mr. Barrette "assumes three facts he cannot know or assume: (1) Barrette does not know if Nick Maly would have had to change lanes into lane 5 if he was driving 55 mph; (2) Barrette does not know if Nick Maly could have stayed to the left of the [sic] lane 5 and avoided impacting the truck; and (3) Barrette does not know if Nick Maly had the opportunity to perceive the Schneider trailer before he changed from lane 3 to land 4 where his view was allegedly obstructed by a white box van." [192, at 10.] The Court is not persuaded. These are not as much assumptions as they are alternative scenarios. Mr. Barrette clearly states that his conclusion is based on the assumption that Nick Maly began breaking at the same location 125 feet away from the collision point, but at an initial speed of 55 mph instead of 73.5 mph. Defendants are free to cross-examine Mr. Barrette as to why he did not consider these alternate scenarios, but Mr. Barrette's failure to do so does not impact the admissibility of his opinion.

(affirming the exclusion of an expert's opinion that lacked "the recognized hallmarks of scientific reliability" where there was "*no test administered*" to justify the expert's hypothesis that a component of a scaffolding system broke because of overtightening).

And from a common-sense perspective, reducing an impact speed by nearly 50% (*i.e.*, from 57 mph to 31 mph) surely would result in *some* change in the outcome of the collision. Because this issue is of such high importance in this case—*i.e.*, whether Amber Adams might have survived the crash but for the speed at which Nick Maly was driving in the seconds before impact—there would be a substantial risk of misleading the jury if an otherwise credible expert were to opine on this issue without demonstrating a scientific basis for doing so. Thus, although the Seventh Circuit has commented "that 'shaky' expert testimony may be admissible, subject to attack on cross-examination," *Bielskis*, 663 F.3d at 894, the unreliability of Mr. Barrette's methodology coupled with the importance of this subject matter create a potential for prejudice that is too significant to leave in the hands of the cross-examiner. For these reasons, Mr. Barrette is precluded from testifying that the outcome of the collision would have still occurred *to the same degree* at either impact speed, or that Nick Maly's speed was not a contributing factor to the outcome of the collision.

To be clear, Mr. Barrette is still entitled to offer the remainder of this opinion, including his conclusion that had Nick Maly been traveling at a speed of 55 mph when he entered Lane 5 of I-88 (125 feet from the collision point), the collision still would have occurred, and that his speed at impact would have been 31 mph instead of 57 mph. Mr. Barrette is prohibited, however, from testifying that, had Nick Maly been driving 55 mph when he entered Lane 5, the "penetration into Amber's occupant compartment would have still occurred to the same degree it

did in this crash," or that Nick Maly's speed was not a contributing factor to the outcome of the collision.

### 2.     Opinions Regarding the Credibility of Witnesses

Defendants seek to bar Mr. Barrette from offering opinions as to the credibility of Defendant Jackson and Hanni Merrit, a witness to the accident. Because Mr. Barrette did not include any opinions regarding witness credibility in his expert report, he is prohibited from offering any such opinions at trial. See Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 37(c)(1).

That being said, Mr. Barrette is entitled to some leeway in presenting these opinions as they relate to the opinions that he did disclose. For example, if Mr. Barrette testifies that Defendant Jackson's tractor-trailer moved 12.8 feet upon impact, and if Defendant Jackson makes a contradictory statement (*e.g.*, that the tractor-trailer did not move at all upon impact), it would be fair to ask Mr. Barrette to address these competing versions of the facts, provided his response is based on reliable scientific principles. Mr. Barrette may not, however, "offer opinions as to whether [he] believe[s], or disbelieve[s], the testimony of particular lay witnesses, 'because an expert cannot testify as to credibility issues.'" *Paine ex rel. Eilman v. Johnson*, 2010 WL 749863, at *3 (N.D. Ill. Feb. 25, 2010) (quoting *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000)). In other words, while Mr. Barrette may explain why Defendant Jackson's contradictory statement is scientifically unsound, he may not testify, as he did in his deposition, that Defendant Jackson may have had ulterior motives for making his statement. Similarly, if Mr. Barrette testifies that Nick Maly's vehicle never entered the shoulder, and if other witnesses offer conflicting eyewitness accounts, it would be fair to ask Mr. Barrette to explain these

conflicting statements, as long as Mr. Barrette's responses are rooted in scientific principles and do not attack the credibility of the witness.[8]

### 3. Opinions Regarding Nick Maly's Line of Vision While Driving

Mr. Barrette opines that Nick Maly entered Lane 5 of I-88 125 feet from the point of impact. At his deposition, Mr. Barrette testified that Nick Maly's first opportunity to perceive Defendant Jackson's tractor-trailer was when Maly entered Lane 5, because prior to that point, Maly was driving behind a white box truck that impaired his line of vision. Defendants seek to exclude any opinions related to Nick Maly's visibility while driving, arguing that Mr. Barrette took no measurements and did no calculations regarding what Nick Maly's visibility would have been while he was behind the box truck. The Court agrees. *Wendler*, 521 F.3d at 791–92 ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."). More importantly, Mr. Barrette did not include any opinions regarding Nick Maly's visibility in his expert report, and thus he is prohibited from offering any such opinions at trial. Fed. R. Civ. P. 26(a)(2)(B); Fed. R. Civ. P. 37(c)(1). Mr. Barrette confirmed as much at his deposition, stating that he is not going to offer any visibility calculations or opinions in this case. [192-3, at 17.] Thus, Mr. Barrette is barred from offering any opinions regarding the extent to which the white box truck impaired Nick Maly's vision or when Maly first perceived Jackson's tractor-trailer.[9]

---

[8] Mr. Barrette's comment at his deposition that Ms. Merritt's perception was wrong is not a statement about Ms. Merritt's credibility, but rather a factually-supported opinion regarding her ability to perceive the accident from her vantage point. As an experienced crash reconstructionist, Mr. Barrette is entitled to opine on this issue without, as Defendants suggest, certification as a human-factors expert or without engaging in extensive "calculations, measurements or tests regarding Merritt's visibility." [192, at 18.] Mr. Barrette is allowed to defend his disclosed opinion regarding whether Nick Maly's vehicle entered the shoulder by explaining his (scientific) rationale for rejecting any conflicting accounts that were presented to him, subject to cross-examination.

[9] This "visibility" opinion is categorically different than Mr. Barrette's opinion regarding Ms. Merrit's statement that she saw Nick Maly's vehicle enter the shoulder because the former is a standalone opinion that was not included in Mr. Barrette's expert disclosures, whereas the latter is a justification of a disclosed opinion in light of contradictory testimony.

### 4.    Opinion Regarding the Force of the Impact

Defendants seek to exclude Mr. Barrette's statement that the impact of the collision pushed Defendant Jackson's tractor-trailer approximately 12 feet to the north, arguing that Mr. Barrette's basis for this opinion is not based on reliable data or reliable scientific methods. The Court disagrees. Mr. Barrette reached his conclusion by determining the locations of the vehicles pre- and post-accident (by reviewing the debris, the tire marks, scratches and gouge marks, etc.) and measuring the distance between the two. [See 192-3, at 28–29.] Mr. Barrette then tested his conclusion by making a calculation of the force necessary to move the truck that distance, and confirming that a collision at 57 mph would have been capable of producing such a force. [See 192-3, at 29–30.]

Defendants object to the reliability of both aspects of this opinion, arguing that (a) the tire marks that Mr. Barrette used to determine the movement of the tractor-trailer may have been preexisting, and (b) Mr. Barrette based his calculation on certain assumptions and/or approximations (*e.g.*, the weight of the two vehicles) without confirming these facts. While these may be shortcomings in Mr. Barrette's analysis, they do not warrant the exclusion of his opinion, which the Court determines is based on reliable scientific methodologies. Defendants are free to cross-examine Mr. Barrette on these issues at trial.

### 5.    Opinion Regarding Emergency Situations

Defendants seek to exclude the following opinion offered by Mr. Barrette:

> There were numerous regulatory signs on I-355 along Mr. Jackson's route indicating "Emergency Stopping Only – 2 Hour Limit." Mr. Jackson, in a non-emergency situation, stopped and parked his vehicle on the shoulder and roadway, in violation of the Illinois Vehicle Code. Mr. Jackson did not experience an emergency that qualified him to stop or park on the shoulder.

[192-4, at 22.] Defendants first argue that what constitutes an emergency is a legal conclusion. Generally speaking, the Court disagrees for the same reasons stated above, namely that the term

"emergency" carries no legal significance in this case. That being said, Mr. Barrette's goes beyond simply stating that Defendant Jackson was in a "non-emergency situation" by opining that, by pulling over to the shoulder, Defendant Jackson violated the Illinois Vehicle Code. This *is* an impermissible legal conclusion, and Mr. Barrette is prohibited from offering this opinion at trial. See *Jimenez*, 732 F.3d at 721.

Second, Defendants argue that Mr. Barrette's opinion as to what constitutes an emergency is based on insufficient facts and data. Specifically, Mr. Barrette testified at his deposition that Defendant Jackson's detour onto I-88 did not present an emergency because there is no danger of low overpasses or low bridges on a Class I interstate highway such as I-88. Defendants argue that this statement is factually inaccurate because I-88 eventually leads into downtown Chicago, where there are low overpasses. While this may be true, the fact that I-88 eventually leads into a residential area is not sufficient evidence to preclude Mr. Barrette's opinion entirely; Defendants can raise this point during cross-examination.

Third, Defendants argue that Mr. Barrette is not qualified to opine as to what constitutes an emergency for a truck driver, based on the fact that he is an accident reconstruction expert with no experience as a truck driver. Plaintiff counters by claiming that in addition to being a crash reconstruction expert, Mr. Barrette's experience as an accident investigator for the Lake County Major Crash Assistance Team makes him qualified to opine about whether Defendant Jackson faced an emergency situation. While the Court agrees that Mr. Barrette was retained as an accident reconstruction expert and thus his opinion regarding whether Defendant Jackson faced an "emergency" prior to pulling over to the shoulder sticks out like a sore thumb amongst his other accident-reconstruction opinions, because Mr. Barrette is prohibited from opining whether Defendant Jackson violated any laws or regulations, the only remaining portion of

Mr. Barrette's opinion is that Defendant Jackson did not need to pull over based on concerns of low overpasses because I-88 does not have any low overpasses that might have presented a safety risk. This testimony, as sanitized, is within Mr. Barrette's area of expertise (based on his experience both as a highway patrolman and an instructor with the Center for Public Safety), and the Court concludes that he is qualified to offer this opinion, subject to cross-examination.

### 6. Opinion Regarding Whether Nick Maly Drove on the Shoulder

Defendants seek to exclude Mr. Barrette's opinion that "[t]he Mercury Montego, driven by Nicholas Maly * * * never entered the right-hand shoulder prior to impact," [192-4, at 22], arguing that Mr. Barrette "offers no calculations or data to substantiate this conclusion." [192, at 32.] Defendants also point to the contradictory testimony from witness Hanni Merritt who claims to have seen Nick Maly pull onto the shoulder prior to the collision. Defendants' motion is denied.

Mr. Barrette's opinion is based on his review of the tire marks from Nick Maly's vehicle, which allegedly originate in Lane 4 and continue into Lane 5 and, if followed to the point of impact, show that the vehicle never crossed into the shoulder. Defendants do not object to Mr. Barrette's methodology, but rather his conclusion, arguing that the tire marks stop short of the collision point and there is a span of at least 13 feet where it is unclear whether Nick Maly's vehicle entered the shoulder. But for the Court's purposes, the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Because the Court finds no fault with Mr. Barrette's methodology, his opinion is admissible, again subject to cross-examination.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment [186] is granted in part and denied in part, Defendants' motion for summary judgment [189] is denied, and Defendant's *Daubert* motions [192, 193] are granted in part and denied in part. This case remains set for a jury trial to commence on December 5, 2016. The Court will set pre-trial deadlines in a separate order.

Dated: June 2, 2016

_____
Robert M. Dow, Jr.
United States District Judge